Okay. Our final appeal this morning is Hunstein v. Preferred Collection and Management Services. Judge Chouflat, who was a member of the panel that first heard this case, is listening in by phone, so he is participating, and Valerie, is he connected? Yes. Okay. Mr. Bonin, will you come and speak with us? Good morning, and may it please the Court. My name is Tom Bonin. I represent Mr. Hunstein in this case. Based on the briefing and the general requirement to handle jurisdiction first, I'm just going to dive right into the standing issue, which has certainly evolved since I filed Mr. Hunstein's complaint in April 2019. As we know from Spokio, every single factor matters. I'm going to skip through pretty much all of them, though I'm happy to discuss any of those specific matters. I think the two that are really particular to this case are particularity and then also concreteness. The letter in question is certainly particular to Mr. Hunstein, so let's go ahead and just based on the information that's in the letter, so let's just dive into concreteness. We're presented with the, kind of the issue of determining how you determine a harm is real but yet intangible. Obviously a tangible harm, let's look at it like a brick that you can hold in your hands is easy to identify, but what about the intangible feeling of a pile of bricks hitting your stomach when you feel you've been exposed, and that's really what we're talking about here today is privacy issues. When we're talking about concreteness, we have the benefit of a very recent Supreme Court decision, Ramirez, telling us that we really look at two factors here. We look at what the congressional judgment was, because they can elevate de facto harms to that next level, but that's not enough, according to Ramirez. It also has to have a historical analog to typical common law causes of action. The one we're focusing on here, Mr. Hunstein's claim, is invasion of privacy. What's interesting about these common law analogs is it does not have to be an exact match, which I believe makes sense, because as common law has developed in this country, there may be different factors that arise in these different common law claims like invasion of privacy. For example, in Ramirez, we have footnote six, which talks about mail vendors from the majority's opinion, that talks about publication, and then we have footnote six of the dissent by Justice Thomas, actually six, seven, and eight, that talks about publication as well on various common law claims. They seem to reach two different conclusions there on how many people you need to publish this information to. Justice Thomas' footnotes, he mentioned ... Pretty sure the dissent doesn't control our inquiry, right? That's correct, Your Honor. Let's talk about your complaint. Let's talk about what the communication was that you say violated the act. Rather than preparing, this is paragraph 16, rather than preparing and mailing a collection letter on its own, preferred sent information regarding Mr. Hunstein and the debt to a commercial mail house. The mail house, this is paragraph 19, then populated some or all of this information into a pre-written template, printed and mailed the letter from California to Mr. Hunstein's residence in Florida. The FDCPA defines communication at 1692A3 as the conveying of information regarding a direct, directly or indirectly, to any person through any medium. The sending of an electronic file, this is paragraph 21, containing information about Mr. Hunstein's purported debt to a mail house is therefore a communication. Just sending it to the mail house is when you allege the violation occurred, right? That's correct. It occurred without regard to whether it was even read, right? That's correct. So, really, the presumption that we're operating on is, based on the way the mail houses work, is that in order to combine these two things, that there was some sort of different process than, say, just communicating it. Let's say I sent a text, right? If I send that text, there's no other party that's saying, hey, you might not want to send that, or you might want to format it differently. And I believe in one of the amicus briefs, which there are several, but I believe it was the one on behalf of the creditor's bar, there was an argument raised that, you know, these mail houses are actually beneficial because they assist in compliance. And I think that's really where it differentiates in this particular type of third-party disclosure as opposed to, you know, just routinely sending something through the mail. You know, where it's going to be in the envelope, there's no additional influence or effect that's occurring by the third party. So can I ask you a question? Because in paragraph 32, where you state sort of your claim, you say that the information was disclosed specifically to employees, an unspecified number, but employees. And I guess my question is, given the fact that we're here at 12b-6, is there not some rational inference that, you know, that we can draw that perhaps the thing was read by somebody? And that's our understanding on how printing actually works. I had the benefit of a paralegal who used to be in the printing business, so he was familiar with how printing vendors work in this context. And usually the employees do have access and they do have the ability to read or examine to make sure that the letter's not going out completely. But your allegation of what constituted the violation was the sending of that information to the mail house, and the violation was complete then. Is that right? I would say yes. And I believe... But I thought you said a moment ago. That's what I was asking. Correct. And I appreciate it. Thank you for the opportunity to clarify. And so I just want to make sure that we've got our head around this. So it's true that in paragraph 16 that the Chief read to you, it says to the mail house, in paragraph 32, which is under count one, preferred violations of the FDCPA, preferred violated 15 U.S.C. 1692CB when it disclosed information about Mr. Hunstein's purported ACH debt to the employees of an unauthorized third-party mail house in connection with the collection of any debt, right? That's correct. So the way that we viewed it when drafting the complaint is when they communicated it to the mail house, it was inherent that some of the employees are going to have access to it. Without regard, though, to whether they actually read it. I mean, it may be just a computer program that populates that information into the pre-printed letter and sends it out. And whether anyone actually read or perceived that information is unimportant. And that's a very good point. It's difficult on the consumer side where we don't have the benefit of knowing what's going on behind the scenes. In this case, for example, we have not had the chance to even amend the complaint, let alone carry out discovery. But you have not alleged that anyone read or perceived it, right? Correct. We said that the employees received it. It was more of, I believe... You may be giving it up, but what do you make of the paragraph that Judge Newsom read to you? And I think the fact that the... So assuming that it was a situation where the employees have to read, I mean, our understanding how most of these companies... We're at the 12th. Forget about how things work in the real world. Yeah, no problem. We got to take the complaint and then draw reasonable inferences. There's a complaint that the Chief Judge read to you, which you seem to embrace. And then there's a paragraph that Judge Newsom read to you, which you seem to be walking away from. That second paragraph, 30-something, I forget the number, says that it was disclosed or read by employees. Does it not? Correct. You're telling us now, I want to be very clear about this too, you're telling us now that that allegation is irrelevant and you are disclaiming it? No, and I appreciate the opportunity. I believe it's very relevant that the employees have saw it when they were... Did you allege that, though? Did you allege that they read it or perceived it? I don't... Did you allege that? I believe I did not allege it clearly enough, based on the questions here. Did you allege it at all? Where did you allege it? When we were talking about communicating the mail house, I believe it was inartfully drafted that we were assuming that, hey, the mail house is operated by employees and those employees are receiving it. We did not contemplate it. It may have been because you didn't think you needed to, right? This entire case took place before Moransky and certainly before TransUnion. Didn't both of those cases clarify what's required? That's correct, and upon amending the complaint, we would certainly go into more detail on certain of those aspects that we now know we should. So is all that's missing here, so you've got an allegation of disclosure to a mail house, you have further allegation of disclosure to employees, is all that's missing is a specific allegation that, oh, by the way, these flesh and blood employees opened their eyes and read this thing? Is it irrational to think that that's what would have happened at 12B6? I think it would be very difficult on our end to know at this stage how many employees or which specific employees, which may ultimately become a factor through discovery. If the only employee who was on the line couldn't read, it's going to be really hard to argue any damage. Let's talk about an alternative point, okay, and that is even if they read it, wasn't this exact argument made in what you call, Ramirez, I call TransUnion, that there was publication to employees or a mail house, what the Supreme Court termed an internal communication, and the Supreme Court said very clearly, even though that argument was raised for the first time and it had been forfeited, they then said, this is footnote six, in any event, it is unavailing. And they went through a few problems with that argument and then ended with this. In short, the plaintiff's internal publication theory circumvents a fundamental requirement of an ordinary defamation claim, publication, and does not bear a sufficiently close relationship to the traditional defamation tort to qualify for Article III standing. Now here, the comparator tort requires publicity, which is even greater universe of people to whom the information has been communicated. You agree with that, right? So and on that point, with one of the clauses for Ramirez, it was they held standing when it was disclosed to a third party creditor. They didn't really look into who that third party was. But the argument that we're talking about here, just communicating it to the employees of the mail house vendor, this was specifically rejected by the Supreme Court, wasn't it? I would respectfully say that it was in the footnote. It was in a footnote. Footnotes are bad practice. I'll be the first to agree. But we have to read them, right? Absolutely. Didn't they reject that your very theory, if that's the argument, that communicating it to a mail house vendor counts? The way that I read that footnote was that they said they had not necessarily held, but it was very much in. What's equivocal about the sentence I just read to you? There's not a not necessarily in it. In short, the plaintiff's internal publication theory circumvents a fundamental requirement of an ordinary defamation claim, publication, and does not bear a sufficiently close relationship to the traditional defamation tort to qualify for Article III standing. What's equivocal about that? The way I would distinguish that from this case is that it hasn't been established that the mail house and their employees are part, are the same intercompany communication that we had in there of TransUnion, where there's no disclosure outside of the company itself. How would this qualify as publicity under the common law definition? So underneath the common law definition, especially with some of the cases cited by Justice Thomas, as long as it's brought to the mind of one other person besides the drafter and the recipient, that could be viewed as publication. For all the potential merits of Justice Thomas' theory, which I find quite interesting, we're not bound by or even allowed to operate under that theory, are we? Don't we need to respond to the Supreme Court's majority opinions? That's correct. And as far as publicity is concerned, I think part of the issue is how public does it need to be in a case like this. Counsel, I'm sorry. Related to that, but also getting back to footnote six, it seems like there might have been a difference between that case and this case because of the procedural posture, right? I mean, there, there had been a trial. We knew what all the facts were. We knew that there were no facts that showed that there was communication to employees. There was no publication. Here we're at the motion to dismiss stage. Is there some reason why that is not, is that, do you think that that is a distinction with meaning or a distinction without a difference? I do think that there's a distinction there that is material to this case. Just from practicing on fair credit reporting claims, there's a big disparity. What's the material distinction? The material distinction between the two is that they had the benefit of actually seeing how, what the level of disclosure was. Well, but the Supreme Court did it not, accepted, for the sake of the argument, that it was communicated to the mail house vendor, right? And rejected that as satisfying the publication element. What is, what's the distinction left to be made? I would say the distinction of who actually received the, it really seems like there's a distinction between what they view as a different company and what they view as an insurer company, the communication. You've been answered. Go ahead. No, no, no, go ahead. No, I was going to, I was going to try to, he's, he's gone over time. Yeah, let me just, so just to sort of tie up footnote six, I guess the way I had read footnote six, and maybe this is what you're getting at, is that the Supreme Court, despite the fact that the argument was forfeited, says with respect to intra-company disclosures, no. And then with respect to vendors, which are not formally intra-company, the Supreme Court, all the Supreme Court says with respect to vendors is, well, courts haven't necessarily concluded that that satisfies the publication element. It sort of leaves it, I don't know, like to be decided. Is there more to it than that? With respect to vendors in footnote six? That's the way I understood it as well. Thank you. Oh, you've saved ten, we'll give you your full ten minutes. I'm willing to, I know I went over, I'm willing to forfeit some more time. Don't bid against yourself. Mr. Dvoretsky, I don't know if I pronounced your name correctly, and if I haven't, I apologize. Good morning, Your Honors. May it please the Court. Shai Dvoretsky with Skadden Arps on behalf of Preferred. Under TransUnion and Spokio preceding it, there are two questions in the standing inquiry. First, what is the harm that Congress contemplated, and has the plaintiff in this case alleged that harm? And second, how does that harm compare? Does it have a close relationship to a common-law tort? So starting with the first question, and this may be a narrower, more case-specific way to decide this case without getting into some of the more difficult questions in the briefing about kind versus degree, Mr. Hunstein can't show standing here, no matter what he argues about the close relationship test, because the FDCPA doesn't recognize Mr. Hunstein's alleged injury. Isn't that a merits question? It overlaps with the merits, but under TransUnion and Spokio... You're telling us to decide a standing... I don't want to interrupt your flow of argument, but it seems you're headed down the road of saying that because the statute doesn't provide a cause of action for Mr. Hunstein, he therefore doesn't have standing. And that seems to me to get very close to conflating the two. Judge Jordan, I think the question is not whether the statute creates a cause of action, but it... No, but whether he has a cause of action on the merits here. But I think the question... That's a 12B6 question, not a 12B1 question. But I think the initial question for standing purposes is what was the harm that Congress contemplated? And the only way that we can assess whether there is a close relationship between that harm and the common law tort is by first asking, well, what is the harm that Congress contemplated, and did Congress contemplate this harm? To the extent that requires looking at the merits at the standing phase, that's simply a function of the two-step test that the Supreme Court has set up. And it's also the same framework that this Court applied in Salcedo when it was looking at whether a single text message was a violation. And other circuits have done the same thing. This is simply the result of TransUnion and Spokio. And under that analysis, a few key points. First of all, Congress legislates against a backdrop of common law rules. And that includes the law of agency. If Congress wants to abrogate agency principles, it needs to do so by clear statement. We know that... law come from. If Congress wants to abrogate the common law rule of agency, it must do so by a clear statement. The clear statement rule comes from, like, constitutional cases that talk about abrogating a state's immunity from suit and other sort of similar things. You're telling me that there's a clear statement principle about abrogating the common rule of agency? If so, I'd like to know where it comes from. So let me suggest two cases from the Supreme Court. One is Meyer v. Holly, 537 U.S. 280 at 285 to 87. And that dealt with the Fair Housing Act. And the Supreme Court said, look, it provides for vicarious liability because, quote, when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rule and consequently intends its legislation to incorporate those rules. Meyer also cites United States v. Texas, quote, in order to abrogate a common law principle, the statute must speak directly to the question addressed by the common law. For that, and it's also important to you — It's not quite the same as a clear statement rule. Well, I think it's a requirement that Congress has to directly address the question. Congress must — the statute must speak directly to the question addressed by the common law. The question addressed by the common law is agency. Can I ask you just a question before we get too far down the road on agency? On what basis would we conclude on this skimpy record, which is to say none, a complaint that CompuMail was the agent of Preferred? Like, what factual — I think we've said time and time again that the nature — that in the nature of an agency relationship, that's a factual issue. What facts do we have to determine that relationship? So I think, again, looking at the complaint, and this is at Appendix Page 11, the central allegation of the complaint is that — the central allegation of the complaint, as the Court was reading with my opposing counsel earlier, is at Paragraph 16. Rather than preparing a mailing collection letter on its own, Preferred sent information regarding Mr. Hunstein and the debt to a commercial mail house in and around Concord, Colorado, and then the mail house then prepared the letter. But how do we know that's an — it could be an independent contractor, right? It's not necessarily an agent. Even if it were an independent contractor, though, that wouldn't make a difference. Because the independent contractor would still be acting on behalf of — on behalf of Preferred. The key point is that Preferred, as a corporate debt collector, can only act through its agents, whether those agents are employees, whether they're independent contractors, whether they are vendors. In any of those situations, the individual carrying out Preferred's wishes is acting on its behalf. And the test for agency, under the restatement, is quite simple. The test for agency is, is there a fiduciary relationship where a principal manifests dissent to another person, an agent, that the agent will act on behalf of the collector? All of that follows from the — on behalf of the — not on behalf of the collector, on behalf of the principal. All of that follows from these factual allegations. And so there is no factual question about whether an agency relationship was established. And whether that agency relationship takes the form of employee, independent contractor, or otherwise doesn't make a difference. Can I ask you a hypothetical? Sure. If the agent-slash-vendor distributed the financial information about the debt and on whose behalf it was incurred, the miner's name, et cetera, et cetera, to the public at large, what would your position be with regards to the step one of transunion and spokio? I think in that situation, the principal, Preferred, would be vicariously liable for what I think would be the agent's violation of the FDCPA undertaken on behalf of the principal. Which means that you're really talking merits. On that first point, you're really talking merits. Ah, what, I, we're, merits overlaps with the standard. They're not, Congress is not trying to worry exclusively, again, this is my perspective, I don't speak for any of my colleagues. Congress is not trying to speak only to the practice of the debt collector and, as you say, its agents. It's also talking about how that affects the consumer, right? It's a two-way street. If the debt collector does something that is prohibited because it's deemed an abusive or improper practice, it necessarily or usually harms the consumer, right? Sure, but the way that Congress gets at that is by regulating the conduct of debt collectors. Here... So you're saying it doesn't regulate the conduct of agents at all? Well, it directly regulates the conduct of debt collectors. I know. The common law of agency then, I think, sweeps in agents, and that is precisely... So if the agent, so if the agent violates the Fair Debt Collection Act, you've got a cause of action on the merits? I think you probably would have a cause of action on the merits against the principal, and for that reason... The opposition is because there's no cause of action here, he lacks standing.  The question is whether Congress tried to prohibit communications between a principal and an agent, between the debt collector and the... But you just told me that if the vendor slash agent distributed the information it got from the debt collector to the public at large, there'd be a violation of the FDCPA. Did you not just say that? I think there would be. That, of course, is not what's alleged here. The allegation... Isn't that because there's publicity in that case, but there's no publicity here? Precisely. I think that's the difference that you're articulating, right? Precisely. In that situation... Just so, in answering Judge Grant's question, how do we know from the face of this complaint that there's no publicity? Because there is no allegation of any dissemination of this information to the public at large. Okay, but you said, and I think quite correctly in your brief, because this is the law, that there is dissemination to the public at large or to a sufficient number of persons that render it substantially certain that it will reach the general public or some such, right? So, you know, Google discloses a user's browsing history on an internal email list to all 140,000 of its employees, no standing? First of all, you'd have to allege in the complaint something that would suggest communication that would be substantially certain, as you correctly quoted, Judge Newsom, to the public at large. Nothing like that is alleged here. As discussed earlier, there isn't even an allegation that this was read, let alone the surrounding circumstance that we're talking about, a company besides Google. So the complaint, I guess, then needed to allege the number of employees that companies like CompuMail has. So I don't think it needed to allege the number of employees, because I think there is a key distinction between disclosure to the public at large and a private communication. And that's not a numbers game. You can have a disclosure to the public at large, even if not that many people actually read the facts. You can have a private communication, even with a large number of people. And I think the restatement Let's take up a hypothetical. The vendor in this case, the agent, to use your language, somebody who's in charge of receiving the communications from the debt collector, thinks that this information is really funny. He's got a bad sense of humor, but he thinks it's really funny. And he brings everybody together, 500 employees, puts them in a huge conference room, and puts up the communication on the screen so that everybody can see it, and he cracks a bad joke about it. The joke falls flat, but he discloses it to everybody. What's your answer? So first level answer is, again, that's not alleged here. And I think it is really important to look specifically at what is alleged. It's a hypothetical. So I'm trying to get you to tell me the extent of the first principle on point one, not point two, but point one, that intracorporate disclosure can never be enough. And so I want to test that with a hypothetical. So tell me what happens in that hypothetical. So if that were alleged, and we were in the world of that hypothetical. I'm alleging it. I'm alleging it. I'm the plaintiff. I'm alleging it. So I would look in that situation at the restatement to understand what the essence is of this tort. And if I can read a little bit from the restatement, I think it will answer the question, to your hypothetical. This is section 652D, publicity given to private life. The operative language is, one who gives publicity to a matter concerning the private life of another is subject to liability for the other for invasion of his privacy. If the matter publicized is of a kind that would be highly offensive and is not of legitimate concern to the public, the restatement then gives two examples of, two non-examples of this tort. One is where a creditor sends a letter to an employer about a debt. That's a private communication. That's a non-example of publicity. The other, this gets back to Chief Judge Pryor's point about transunion. The restatement contrasts the publicity requirement for this tort versus the publication requirement for defamation. And it says that when you've answered my question, I have another one for you. And this is just something that intrigues me. If we're supposed to be looking at common law analogs that existed at the time of the creation of the republic, why are we looking at the restatement? Well, it didn't exist back then. Neither did these torts though. We're looking at the restatement. That's a separate question. I'm asking you why we are entitled to look at the restatement if the restatement didn't exist and didn't, and doesn't pretend to codify in an advisory way what the tort should have been back in the 1700s or the early 1800s, but tells you what the tort based on a huge collection of academics, lawyers, judges, et cetera, should be now. Why are we looking at the restatement? Judge Jordan, first of all, I would say you shouldn't look at the restatement if you accept that the only torts relevant are the ones that existed in 1789. But for better or worse, the Supreme Court has flatly rejected that proposition in transunion, right? It specified this tort as a valid comparator. And once we look at this tort, the only way to understand this tort is by looking at the leading authorities that explain what it is, and the restatement sheds a great deal of light on that. Well, the Supreme Court has looked at the restatement in this kind of context, right? Correct. That's why we're looking at it, right? Shows how messed up the standing doctrine is. Because you're supposed to be looking at common law analogs that existed when the Republic was framed, because that's what the Constitution seemed to have accepted. And yet we're looking at the restatement, which is a modern creation of the 20th century. And Judge Jordan, as a matter of principle, I wouldn't disagree with you. But then the answer to this case would be these torts first arose out of a law review article in 1890. So that would be the end of this case because the torts didn't exist. Whether we think that's a good idea or not, it's really kind of beside the point, right? Correct. We're obliged to take the Supreme Court's precedent seriously and apply it. And they've looked at the restatement, right? Correct. Can I ask you a quick question? Because you skipped over it earlier. And you may well be on your way to getting there anyway. But so, you know, look, my sort of struggle with this case is very public. I've tried to figure out what to make, sort of how to make sense of the doctrine coming out of Spokio and TransUnion. But so you don't, I think in your, I understand in your brief that you acknowledge, repeatedly, I think really, that the similarity that is required under Spokio and TransUnion is one of kind and not degree, correct? Yes. Okay. I just wanted to make sure if that's true, that we've all sort of got our bearing straight there. So then the difficulty for me, and again, I've been, it's all out there for people to read about, me sort of thinking my way through this, is that once we're in kind land, not degree land, in answer to Judge Grant's question about publicity, I just don't know how at an allegation about an unspecified number of employees to a conclusion that it is inconceivable that that disclosure could have been substantially certain to reach the general public, or whatever the standard is. Two points, Judge Newsom. One, I don't think the question at the 12B6 stage is whether it is inconceivable or not. I think the question is what has the plaintiff actually alleged? Yes, so he has now an indication of employees, and now is it plausible or reasonable to infer that that might have been more than a handful of employees, and that those more than a handful of employees might have done what Judge Jordan suggested, or otherwise communicated this more broadly? At which point we have publicity, right? So first of all, again, I think the question is what's the standard at the 12B6? Second, if you had a situation where the employees themselves at CompuMail communicated this more broadly, an employee decided, this is really funny, I'm going to take out a Judge Jordan's hypothetical. At that point, we have a totally different case. At that point, you might have an argument for vicarious liability against the principle for what would be a communication to the world at large. But just like, so to go back to my hypothetical, forget about the mail house. Let's assume this is just a purely intra-company communication. Google discloses a user's browsing history to 140,000 of its employees. Never goes outside the company. Is that publicity? Is that sufficiently close to publicity? I think that alone would not be. Wow. Because if you look at what publicity, if you look at what this public disclosure of private facts tort is about, it is about one's public reputation, one's reputation in the world at large. The origin of this tort came about when newspapers were improperly digging out, digging information and publishing it to the world. Based on, even based on the additional facts that you've given me, Judge Newsom, which of course aren't in the complaint, even based on that, we don't know that Google's 140,000 employees are the world at large. Google's $140,000. I mean, I think it's clear that they're not the world at large, but the restatement says either the public at large or a sufficient number of employees that gives rise to this substantial risk that it will become known to the public at large. And as 140,000 Google employees, does it not give rise to that substantial risk? I don't think it's, first of all, it's not substantial risk. We're talking about a substantial, substantial certainty, substantial certainty. That's a very high bar. So no, 140,000 does not give, just so I'm clear, there is no standing for a person to sue in that circumstance. 140,000 people at Google know all sorts of things that I don't know. There's no risk that they're telling the world about it. That's an intracompany disclosure. The thing that the tort is concerned about is public reputation in the way that comes about from publishing a newspaper article, from putting a sign on a window, storefront. If Google posted this information on their website, that would qualify as publicity, right? I think that would because the internet at that point becomes. And it's not a numbers game because say only two people found their way to it. If it's publicly available, it's publicly available. Correct. Right? Correct. I think of it too as if I have a family secret and I have a very small family. It's my husband and me and one child. It's still a family secret if another family has hundreds of cousins and they tell. That's still not public, right? It's not a difference in numbers. It's a difference in the quality of the disclosure. It is a difference in kind because there is a fundamental difference in kind between your maybe a small number of people, but that's your community versus a private communication. And again, just to follow up. So how then, what then are we to make sense of the other half of the disjunction? I take from your response to Judge Grant that this thing, this dissemination has to be qualitatively public, open to everybody, on the internet, in Times Square, whatever. That takes care of the public at large half of the disjunction. What about the other half of the disjunction that I keep coming back to? Dissemination to a sufficient number of persons that renders it substantially certain to reach the public at large. That sounds like something less than Times Square or the internet. If you also had some reason to think that one of those 140,000 Google employees is actually going to go ahead and post it onto the internet, even though the defendant in the case isn't the one who did so, if you had a reason to think Google employees don't keep secrets, well, perhaps then you could say there's a substantial certainty. But you need those sorts of allegations. And again, just to go back to where this argument started this morning, we are miles from those sorts of allegations, when the only allegation here is that the information was sent to Compumail, which in turn populated it into a computer, which then sent a letter. And so... Can you give me an idea of what would be a substantial certainty? What would be a publication that would entail that substantial certainty? Well, I think it might be the example in the colloquy I was just having with Judge Newsom, where you had 140,000 Google employees who knew the information, plus a reason to think that Google employees don't keep secrets. But you understand, of course, what I would do here. I won't because you're over time and I've taken too much of your time already. But I would just start walking it back from 140,000 to 100,000 to 10,000 to 5,000 to 100 to 50. And as soon as we're having that conversation, now we're in degree land. I don't think we are, Judge Newsom. First of all, again, because the allegations in this complaint, which are zero, like there's not an allegation of any number in this complaint or even any... Is that true? Employees? It's an unspecified number of employees, right? It's an unspecified number of employees in paragraph 32, right? But it could be one. No, I guess it couldn't be one. It could be two or it could be a million. But I think the point is there is no sense, qualitative or quantitative, that there is any risk, let alone a substantial certainty that this is going to reach the world at large. Second, even in the hypothetical that we're talking about, I don't think it's a numbers game of how many Google employees know about it. One Google employee might be enough if you also coupled that with the credible allegation that Google employees don't keep secrets and that they post things on the internet that they should be keeping private. But we don't have anything resembling that here. All we have here is a communication to a vendor, to an agent, which A, is not the sort of thing that Congress meant to create liability for in the FDCPA. If it did, that would disable all corporate debt collectors from functioning at all because they couldn't communicate with any of their employees, all of whom are agents, just like CompuMail is here. That's not true because you'd have to make out a plausible cause of action on the merits. You're conflating coverage and standing with liability. No one's saying that a debt collector can't contract out with a vendor. This is not prohibiting that. It just says you may need to comply with the FDCPA if you do something which is allegedly in violation of the Act. Which is, in effect, prohibiting contracting out with a mail vendor, just as it would prohibit hiring an employee to do the same work that the mail vendor does on behalf of the company. And so Congress never meant to create this sort of liability. This is not what Congress had in mind. And if it had, there would not be any relationship, let alone a sufficiently close relationship of the sort that the Supreme Court required in TransUnion, that this Court, even predating TransUnion, enforced in cases like Moransky and Salcedo. There's no close relationship with a tort that is all about publicity in the world at large. If a company has a trade secret, and a company has 100,000 employees, and all 100,000 employees are aware of that trade secret, is that trade secret public? No. Thank you. Can I ask you just one more? It's going to be the last question. So, I mean, the reason I ask is because you've raised an interesting sort of rebuttal to the line of questioning that I was giving you about if there are a sufficient number of Google employees, and you add the allegation that those employees are untrustworthy. You said that might be good enough. So I'm just curious, is that like, you know, I think for better or worse, we are left to look at the restatement. But in the restatement, I guess, as I read it, the second half of the disjunction is, one, to the public at large, or two, to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. Not to so many persons of a certain type, but just to so many. I mean, so you say it's not a numbers game. It sounds like the restatement makes it a numbers game, for better or worse. I think that sentence in the restatement has to be read in the context of what this tort is about. And what this tort is about is preventing injury to your public reputation. The 100,000 employees at Google or the company with the trade secret, whatever it may be, those are not the public. That is not your public reputation. That may be your reputation within a company, but that is not your reputation in the world or within your community or within the public at large. Thank you, Mr. Ferenczky. Thank you. Mr. Bowne. So I did want to touch on the agency argument. And when we're looking at the statute in question 69-2C, subsection B, it's a general prohibition not to communicate with any person except for a limited list of exceptions. And the final exception on that list is the debt collector's attorney, which I would argue would fall under as an agent based on opposing counsel's definition. So they do specifically talk about a type of agent and felt it was important enough to carve them out from this general prohibition. So I'm not sure if with that clear language we need to fall back on, you know, the common law agency principles that opposing counsel is relying on. So an attorney could not violate the Fair Debt Collection Practices Act if Johns Hopkins had hired the attorney rather than preferred. And the attorney retained the services of a process server to serve the complaint and the information, files a lawsuit, and it's all over the courthouse. Clerk's office, employees, everybody is aware of the information. Would the attorney fall within the definition of a violate the Fair Debt Collection Practices Act? The Supreme Court has held that attorneys could be debt collectors and they can violate in that context. The communication from the collection agency to the attorney to file that lawsuit would not violate the statute because they are carved out. And as far as the process server goes, my argument there is that one of the exceptions is that a court of competent jurisdiction can order, you know, that's one of the exceptions underneath the statute. Most of the time, at least most of the summons that we get down in Florida, it says that you are hereby commanded to serve process on the defendant. So I believe in that scenario with the process server, it would fit underneath that additional carve out in the statute. The other issue on agency I just want to mention is the liability aspect. Obviously, since we don't have the benefit of discovery in this case, I would be interested to find out whether or not the mail house itself considers it an agent based on the liability implications of that determination. But we're not there at that stage yet. Finally, as far as the statutory language goes on the issue of publication, which I understand is not necessarily dispositive based on the Supreme Court, but I do think it's useful to look at that in 1692d, the verb publication is specifically mentioned in regards to debtor's list, but that's not the terminology that Congress used in this case or in this subsection. They said communicate to any person. You may not communicate to any person in connection with the collection of a debt. So I do think there's a distinction there in what Congress actually chose to, the way they drafted this section and why it's such a wide prohibition against communicating to third parties. I think one of the benefits or one of the scenarios that they're trying to protect against was disclosing to, say, your neighbor or someone that you know locally. In that case, it may not be a publication at large at that point. It may just be, you know, people with a, perhaps it's your neighbor or someone that you know, maybe an ex-girlfriend, but that would still be considered an invasion of privacy issue, I would argue. And one final note I wanted to talk about as far as the argument with Regulation F, since it is the new regulation that just went into effect last November. All the references to mail house is talking about letters coming in reverse, so validation notices or request validation, which wouldn't be viewed as debt collection communications, which is required underneath this specific subsection. So a bit of a distinction there. I know that opposing counsel highlighted in that brief, but I did want to make that distinction that the CFPB regulations only talk about using mail vendors in communications, but not debt collection communications, which is specific to this subsection. And then, actually, I just have one final point as far as the case law goes. The Seventh Circuit did come out after a briefing was closed with a FDCPA opinion where they talked about standing. It's slightly different than what we're talking about here. It's within the context of 1692E8, which is failure to mark a debt as disputed, and it was the communication to the credit reporting agency. So, obviously, they're carved out from the statute, but they did do a standing analysis as far as communicating to that third party is concerned. I don't think anyone's going to argue that they're an agent of the debt collector, but it was very, the opinion which just came out was very closely intertwined with what the analysis for standing is in this case. So I did want to bring that to the Court's attention, since it did not, it was decided just after the reply brief deadline. Anything else, Mr. Boehner? Nope. I appreciate the time. Thank you very much. Thank you. We're adjourned.